## Case No. 11,368.

PRATHER v. MICHIGAN MUT. LIFE INS. CO.

[7 Reporter, 293; [1] 7 Ins. Law J. 897.]

Circuit Court, D. Indiana.  1878.

LIFE INSURANCE—DEFENSE OF MURDER—QUANTUM OF PROOF.

Where the defense to a suit on a life policy is that the plaintiff murdered the insured to obtain money, the burden of proof is on the company. But quantum of evidence required is not the same as in a criminal prosecution; a fair preponderance of evidence is sufficient to sustain the defense.

[Cited in Bell v. McGinness, 40 Ohio St. 206.]

On the 31st day of December, 1875, the Michigan Mutual Life Insurance Company of Detroit issued a policy insuring the life of Mary Prather, of Jackson Co., Ind., in the sum of $3,000, payable to her husband, Jno. C. Prather, in case of death. On the 25th day of October, 1876, the insured was taken suddenly sick,

---

[1] [Reprinted from 7 Reporter, 293, by permission.]

and died in about six hours, and was buried the next day. Suspicious circumstances connected with the death coming to the knowledge of the company led it to investigate as to the cause of death. Analysis disclosed the presence of arsenic in the stomach; and, suspicious circumstances pointing to the husband as the poisoner, he was indicted and tried for the crime, but acquitted. This suit to recover the insurance was subsequently brought, and successfully defended, on the ground that the plaintiff has poisoned his wife to obtain the insurance.

Marshall & Brown and Finch & Finch, for plaintiff.

D. Overmeyer and McMaster & Boice, for defendant.

GRESHAM, District Judge (charging jury). This is an action brought by the plaintiff, John C. Prather, against the defendant, the Michigan Mutual Life Insurance Company, on a policy of insurance. issued by the defendant on the life of Mary C. Prather, on the 31st day of December, 1875, for three thousand dollars, for the benefit of the plaintiff. The defenses are: First, that Mary C. Prather died of arsenical poisoning, willfully administered by the plaintiff; second, that Mary C. Prather committed suicide. By these pleas the defendant admits the allegations of the complaint; and, unless it has proved one or both pleas by a fair preponderance of the evidence, you will find for the plaintiff.

The plaintiff is not on trial before you on a charge of murder by administering to his wife arsenical poison. There can be no finding against the accused in a criminal trial, unless the jury are satisfied beyond a reasonable doubt of his guilt. Even if you are not satisfied beyond a reasonable doubt that the plaintiff's wife died of arsenical poison administered by her husband, yet, if you think there is a fair preponderance of the evidence in support of that defense, your verdict should be for the defendant. But, while this distinction exists between criminal and civil cases as to the rule of evidence, it is well to bear in mind that the defense of wilful poisoning is a very grave charge, and should be supported by clear and satisfactory proof.

Certain facts and circumstances in this case seem to be conceded, viz.: That Mrs. Prather became suddenly ill early in the morning of the day of her death; that there was severe and painful vomiting, and some purging, before Dr. Davis arrived, about ten a. m., from which time until death, about one p. m., the patient remained in a collapsed state, pulseless, complaining of burning pains in the stomach, unquenchable thirst, nothing being raised by vomiting but a greenish glairy mucus; that at the post mortem, some ten days after death, after being ligated or tied at either end, the stomach was removed and placed in a glass jar; and that some three or four days later, Dr. Jameson, admitted to be a competent

chemist, analyzed two-thirds of the stomach and contents, discovering therein 0.07 grains of arsenic; that upon opening the stomach for analysis it was found to contain a quart or more of greenish mucus in a jelly form; that the inner coating of the stomach was thickened, enlarged, with blood and grayish spots, scattered here and there over it. Dr. Jameson says these symptoms before death, and the appearance and condition of the stomach after death,—to say nothing of the arsenic found upon analysis,—were recognized evidences of arsenical or other poison. If you believe that Mrs. Prather died of arsenical poison, and that there was no arsenic in the medicine compounded on Dr. Charlton's prescription, how is the poison to be accounted for? The plaintiff testified that himself, his wife, and three small children, the oldest less than nine years of age, constituted the entire family; that there was no servant or other person in the house; that, with the assistance of the plaintiff, the deceased prepared and cooked the breakfast. The theory that the small children administered the poison you will hardly entertain; in fact, it is not relied on by the plaintiff. The plaintiff testified that his wife told him she took one of the pills prescribed by Dr. Charlton, and directly became ill. She said nothing about taking other medicine or drugs, by mistake or otherwise. Did Mrs. Prather commit suicide by taking arsenic without the knowledge of her husband? If she did not, who had the best opportunity to administer the poison to her that morning,—for you will hardly conclude, from the evidence, that the arsenic was taken as early as the evening before. In this connection, you will bear in mind Dr. Charlton testified that on his request the plaintiff, about the time of the post mortem, promised to bring or send to him the medicine he (Dr. Charlton) had prescribed, and that the promise was never kept.

This part of Dr. Charlton's evidence, however, was contradicted by the plaintiff; and the plaintiff further told you that he sent the medicine to his attorneys, Messrs. Finch & Finch, at Indianapolis. If the plaintiff did make this promise to Dr. Charlton, why did he fail to keep it? It is not unfair to assume that Messrs. Finch & Finch took proper steps to ascertain whether the medicine contained anything that would have caused the death of Mrs. Prather. If Messrs. Finch & Finch learned by analysis that this medicine contained arsenical or other poison in sufficient quantity to destroy human life, why was that fact not proved? The fact that all, or nearly all, the medical experts testify that there was nothing in the medicine prescribed by Dr. Charlton, if taken as prescribed, which could have caused death, will also be considered in this connection. Dr. Charlton's prescriptions were as follows: "Subnitrate of bismuth, 1 drachm. Sulphate of quinine, 2½ scruples. Extract of nux vomica, 10 grains. Extract of gentian, sufficient quantity to make a pill mass,—made into thirty pills,—one to be taken before each meal. Bromide of potassium, 1 oz. Mint water, 3 oz. Fluid extract of valerian, 3 oz. Tinct. of digitalis, 2½ oz. Dose: one half tablespoonful three times a day."

It was insisted during the progress of the trial, and also in the argument, that the post mortem and analysis were unfair to the plaintiff; that he should have been present on one or both occasions; that the agents of the defendant, including the attorney, had too much to do at the post mortem, and also with the analysis; and that there was too much opportunity for the introduction of arsenic into the stomach after its removal from the body. You will remember that the medical experts, with perhaps one exception,—Dr. Stevens,—testified that the thickened condition of the inner coating of the stomach, with the blood and grayish spots interspersed over it and the amount of jellied mucus found within it, all strongly indicated that arsenic had been introduced before death, and that the introduction of arsenic into the stomach after death could not have brought about those conditions. You heard the testimony of the insurance agents, the coroner and the physicians, including Dr. Jameson; and it is for you to say, even admitting that the post mortem was conducted in a somewhat irregular and careless manner, whether there is anything in the case which supports the belief that any one in the interest of the insurance company introduced arsenic into the stomach after death. The judgment of the state court granting the plaintiff's first wife a divorce, and allowing her two thousand five hundred dollars alimony, and the subsequent proceedings in the state court, including the sale of the plaintiff's real estate, and, finally, the judgment of ouster against him, and his subsequent letters to his relations, speaking of his embarrassments and need of money, were admitted as tending to show a motive for the crime. The circumstances that the deceased was living with the plaintiff at and before the time of the divorce, that the plaintiff made unsuccessful efforts to get her to leave, that she refused to go unless he paid her eight hundred dollars, and that they were subsequently married, were admitted in evidence as tending to show that the plaintiff was wanting in affection for the deceased. But you will not forget in this connection that a number of the plaintiff's neighbors, and some of the deceased's relations testified that the plaintiff and deceased, after their marriage, apparently lived happily together; that no discord or want of affection was ever observed; and that the plaintiff was liberal in providing for the deceased's wants and comforts. In addition to this, you have heard the testimony of the plaintiff, that he and the deceased lived together on terms of mutual affection, and that he never administered to her any arsenical or other poison.

Counsel for defendant referred to certain things in the conduct of the plaintiff tending

to show guilt: thus, his language at the time he was informed she was to be taken up, and his subsequent actions for some days following that event. It was said that the plaintiff's conduct indicated remorse. and dread of exposure and punishment; while, on the other hand. it was argued that men were not all alike, that some were naturally more affectionate than others, that some were less affected by the loss of mere friends and relations than others. We all know that it is not unusual to find people going about their ordinary avocations the next day after the burial of near relatives. It is for you to say whether there was anything in the conduct of the plaintiff at Seymour, when first informed that his wife's body was to be taken up for a post mortem examination, that indicated guilt or remorse for anything he had done. If you find from the evidence that the deceased committed suicide, or that her husband murdered her by poisoning, your verdict will be for the defendant. If, on the other hand, you are not satisfied that the defendant has a clear preponderance of the evidence in support of one or both of these defenses, then your verdict will be for the plaintiff for the amount of the policy, and interest at the rate of six per cent.. after 60 days from the time proof of death was furnished to the company. If you find that Mrs. Prather committed suicide, there is no evidence which will warrant you in finding that at the time she was insane.

Mr. Finch: I wish your honor would instruct the jury that the presumption of law is that the plaintiff did not kill his wife, and that the presumption of law is that she did not kill herself.

THE COURT: I have instructed the jury that the burden is on the defendant; that the defendant has assumed the burden, and must satisfy the jury by a clear preponderance of the evidence that Mary Prather either committed suicide or was murdered by her husband.

Judge Finch: I wish to suggest this: That, if the jury cannot account for the death at all, then they must find for the plaintiff.

THE COURT: This is included in what I have already said. The plaintiff's position is, that before the policy was issued, his land had been sold, and a deed executed by the sheriff to the purchaser, and that therefore this debt of three thousand dollars, which it had grown to be. could have been no motive for the taking out of a policy and subsequent poisoning of the wife to get the money. I cannot give you that charge. for this reason: If, in fact, the plaintiff was anxious about the judgment, which had stood for some time, if during this time he remained in possession, refusing to quit. and was still in possession when the deed was made and policy taken out. I leave it to you to say whether the anxiety which had been created on his mind by this liability for the sum of three thousand dollars and the loss of his real estate might or might not have operated to induce him to get

the insurance, and afterward take the life of his wife to get the money to reimburse himself.

Judge Finch: I want your honor to say to the jury, as a question of law, that, when that deed was obtained, the right of redemption was lost.

THE COURT: There is no doubt about that. Of course. there was no right of redemption any longer. He had lost his land, and the only question then was whether, having lost it on account of his relations with the deceased, that fact may have operated as a motive. and if so to what extent to commit the crime. If you find for the plaintiff, the form of your verdict will be: "We, the jury, find for the plaintiff. and assess his damages at $————." If you find for the defendant, the form of your verdict will be: "We, the jury, find for the defendant."